COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-06-319-CV

 

 

IN THE INTEREST OF                                                           APPELLANT

E.M.N.,
A CHILD

                                                   V.

 

                                                                                                        

 

                                              ------------

 

           FROM
THE 233RD DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

In two issues, appellant
Donna Lynn J. appeals the termination of her parental rights to E.M.N.,
asserting that termination under section 161.001(1)(T) of the family code
violated her right against the imposition of ex post facto laws and that there
was insufficient evidence to show that termination was in the best interest of
the child.  We affirm.

 

 








BACKGROUND

E.M.N. was born on August 27,
1999; she was almost seven years old at the time of the termination trial.  Appellant testified that E.M.N. was her Amiracle  child@ because Appellant was addicted to cocaine while pregnant with E.M.N.;
within the same context, Appellant made reference to an abusive relationship
with E.M.N.=s father.[1]  The 2001 order establishing E.M.N.=s paternity appointed Appellant possessory conservator and joint
managing conservator with E.M.N.=s father and restricted E.M.N.=s primary residence to Tarrant and Johnson counties.








Appellant was arrested in
November 2002 for her involvement in the murder of E.M.N.=s father the previous September. 
E.M.N. was three years old at the time. 
After her arrest, Appellant initially placed E.M.N. and J.J., E.M.N.=s older half-sister, with Appellant=s brother.  She later arranged
for them to stay with her father in New Mexico, but he became ill.[2]  The New Mexico equivalent of the Texas
Department of Family and Protective Services placed E.M.N. and J.J. with
unrelated foster parents, who were known to Appellant, at Appellant=s request.  Appellant pled
guilty to murder, was convicted, and received fifteen years= confinement in March 2004.[3]  She testified that she would be eligible for
parole in 2010.

In 2003, legal proceedings
over custody of E.M.N. began in Texas and New Mexico.  E.M.N.=s paternal grandmother, Appellee, eventually prevailed in Texas, and
Appellant was removed as E.M.N.=s managing conservator.[4]
Appellee, her niece Martha Jo K., and Martha=s husband Tony, were appointed temporary joint managing conservators
of E.M.N. in January 2006.  J.J. remained
with the foster family in New Mexico.[5]








While in prison, Appellant
sent letters, cards, gifts, and occasionally money to E.M.N., and took a number
of self‑improvement courses. 
Appellee filed a petition to terminate Appellant=s parental rights to E.M.N. in February 2006.  Appellant=s parental rights to E.M.N. were terminated on September 7, 2006,
after the trial court concluded that the involuntary termination requirements
of section 161.001 of the Texas Family Code had been met.  Tex.
Fam. Code Ann. ' 161.001
(Vernon Supp. 2006).  Specifically, the
court based its decision upon the only grounds brought by Appellee:  section 161.001(1)(T), which provides for
termination when a parent has been convicted of the murder of the other parent
of the child under section 19.02 or 19.03 of the penal code and when the best
interest of the child requirement under section 161.001(2) is satisfied.  Id. ' 161.001(1)(T), (2).  Appellant
had been convicted of murder under section 19.02(b)(1) of the penal code, for Aintentionally or knowingly caus[ing] the death of an individual.@  Tex. Penal Code Ann. ' 19.02(b)(1) (Vernon 2003).

TERMINATION OF PARENTAL
RIGHTS








In her first issue, Appellant
complains that termination of her parental rights under section 161.001(1)(T)
violated her right against the imposition of ex post facto laws because her
criminal conviction occurred in 2004 and subsection (T) was not enacted until
2005.  Further, she argues that the trial
court=s application of subsection (T) denied her the use or benefit of
defenses that existed under other, previously-enacted subsections of the
involuntary termination statute.

Standard Of Review

A parent=s rights to Athe
companionship, care, custody, and management@ of his or her children are constitutional interests Afar more precious than any property right.@  Santosky v. Kramer, 455
U.S. 745, 758‑59, 102 S. Ct. 1388, 1397 (1982); In re M.S., 115
S.W.3d 534, 547 (Tex. 2003).  In a
termination case, the State seeks not just to limit parental rights but to end
them permanentlyCto divest
the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child=s right to inherit.  Tex. Fam. Code Ann. ' 161.206(b); Holick v. Smith, 685 S.W.2d 18, 20 (Tex.
1985).  We strictly scrutinize
termination proceedings and strictly construe involuntary termination statutes
in favor of the parent.  Holick,
685 S.W.2d at 20‑21; In re E.S.S., 131 S.W.3d 632, 636 (Tex. App.CFort Worth 2004, no pet.).








In proceedings to terminate
the parent‑child relationship brought under section 161.001 of the family
code, the petitioner must establish one ground listed under subdivision (1) of
the statute and must also prove that termination is in the best interest of the
child.  Tex.
Fam. Code Ann. ' 161.001; In
re J.L., 163 S.W.3d 79, 84 (Tex. 2005). 
Both elements must be established; termination may not be based solely
on the best interest of the child as determined by the trier of fact.  Tex. Dep=t of Human Servs. v. Boyd, 727 S.W.2d
531, 533 (Tex. 1987).

Along with a best interest
finding, a finding of only one ground alleged under section 161.001(1) is
sufficient to support a judgment of termination.  In re B.K.D., 131 S.W.3d 10, 16 (Tex.
App.CFort Worth 2003, pet. denied). 
But termination can only be upheld on a ground that was both pleaded by
the party seeking termination and found by the trier of fact.  Vasquez v. Tex. Dep=t of Protective & Regulatory Servs., 190 S.W.3d 189, 194 (Tex. App.CHouston [1st Dist.] 2005, pet. denied).  Because subsection (T) was the sole ground
alleged under section 161.001(1), we must review whether the constitutional
protections against ex post facto laws apply to this case.[6]








Ex Post Facto Laws








The term Aex post facto@ has often
been used to refer to any law passed after the commission of an act that
retrospectively changes the consequences of the act.[7]  See Grimes v. State, 807 S.W.2d 582,
583-84 (Tex. Crim. App. 1991); In re Shaw, 966 S.W.2d 174, 179 n.3 (Tex.
App.CEl Paso 1998, no pet.).  The
United States Constitution=s ex post facto provision applies only to criminal proceedings;
however, the Texas Constitution=s provisions apply to criminal cases and to civil cases involving
vested rights that are legally recognized or secured.[8]
 U.S.
Const. art. I, ' 10; Tex. Const. art. I, ' 16;  Barshop v. Medina
County Underground Water Conservation Dist., 925 S.W.2d 618, 633 (Tex.
1996); In re A.R.R., 61 S.W.3d 691, 696 (Tex. App.CFort Worth 2001, pet. denied), disapproved of on other grounds by
In re A.V., 113 S.W.3d 355, 360 (Tex. 2003), and In re C.H., 89
S.W.3d 17, 26 (Tex. 2002); Shaw, 966 S.W.2d at 179.  A statute that allows a court to take into
consideration conduct occurring before the effective date of the statute
possesses a retroactive effect.  See
Barshop, 925 S.W.2d at 633.  However,
when the law is procedural or remedial in nature, retroactive application does
not violate article I, section 16.  Shaw,
966 S.W.2d at 179; Sims v. Adoption Alliance, 922 S.W.2d 213, 216-17
(Tex. App.CSan Antonio
1996, writ denied).  And mere
retroactivity alone is not sufficient to invalidate a statute.  Barshop, 925 S.W.2d at 633.  A valid exercise of the police power by the
Legislature, to safeguard the public safety and welfare, can prevail over a
finding that a law is unconstitutionally retroactive.  Id. at 633-34. 

Vested Rights








Parental rights are vested
rights.  See M.L.B. v. S.L.J., 519
U.S. 102, 116-17, 117 S. Ct. 555, 564 (1996); Santosky, 455 U.S. at
758-59, 102 S. Ct. at 1397; M.S., 115 S.W.3d at 547-48; In re R.A.T.,
938 S.W.2d 783, 784 (Tex. App.CEastland 1997, writ denied). 
When determining whether a law retroactively impairs a vested right, we
must consider (1) whether it advances or retards the public interest, (2) whether
its retroactive portion gives effect to or defeats the bona fide intentions or
reasonable expectations of affected persons, and (3) whether it surprises
people who have relied on contrary law for a long period of time.  Sw. Bell Tel. Co. v. Pub. Util. Comm=n of Tex., 615 S.W.2d 947, 956‑57
(Tex. Civ. App.CAustin 1981,
writ ref=d n.r.e.).[9]  








We note that the Texas
Supreme Court has already held the retroactive application of a different
subsection of section 161.001(1) constitutional.  See A.V., 113 S.W.3d at 356‑57.  In A.V., the court reviewed the
constitutionality of the retroactive application of subsection (Q), which
provides that parental rights may be terminated if the parent knowingly engaged
in criminal conduct that resulted in his conviction and Aimprisonment and inability to care for the child for not less than two
years from the date of filing the petition.@  Id. at 358  The parent argued that because subsection (Q)
was enacted in 1997, his pre‑1997 criminal conviction and imprisonment
could not be used to satisfy it.  Id.
at 360.  However, although the parent was
incarcerated before subsection (Q)=s effective date, the court held that its application was
constitutional and that it was a valid ground for terminating his parental
rights.  Id. at 357, 362.








In doing so, the court
considered subsection (Q)=s purpose,
which was to remedy the conditions of abused and neglected children and not to
enhance the punishment of the parent, and stated that it constituted a valid
exercise of police power by the Legislature to safeguard public safety and
welfare.  Id. at 361.  Such an exercise is a Arecognized exception to the unconstitutionality of retroactive laws.@  Id.  It also reasoned that subsection (Q) did not
disappoint any reasonable reliance the parent could have placed on the law when
he was convicted of the federal drug offenses.[10]  Id. at 361‑62. 








Appellant attempts to
distinguish her case from A.V., pointing to the fact that A.V. involved
action by the State, rather than a private action as brought here by Appellee,
E.M.N.=s paternal grandmother.  See
id. at 357.  Appellant argues that A.V.
was initiated by the State to remove the children from a life-threatening
situation in that they were being left alone without sufficient food in
unhygienic conditions, and that, in contrast, her children were fine.  Id. However, although concern about the
children=s status while the father was incarcerated may have motivated the
State=s initial involvement in A.V., the termination occurred because
the father=s acts
satisfied subsection (Q), as Appellant=s act here satisfied  subsection
(T).[11]  Id. at 362.  We must consider whether the reasoning in A.V.
applies to subsection (T) and the facts before us. 

Subsection (T) of section
161.001(1), the ADonna Hoedt@ Act,[12]
was enacted in the memory of a woman whose husband was convicted of murdering
her, and whose mother Aundertook a
lengthy and expensive court battle@ to obtain custody of her four grandchildren when the murderer
retained his parental rights over them.  See
Tex. H.R. Res. 193; see also Tex.
Fam. Code Ann. '
161.001(1)(T).













Similar to subsection (Q),
the reasoning behind subsection (T) is not to enhance the punishment of a
parent who is convicted of a crime.  See
Tex. H.R. Res. 193.  Instead, it is
to remedy the conditions of the children, and their caregivers, in the
aftermath of a parent=s conviction
for the murder of the other parent.  Id.;
see Tex. Fam. Code Ann. ' 161.001(1)(T); cf. A.V., 113 S.W.3d at 362 (stating that
subsection (Q) aims to remedy the conditions of abused and neglected children,
not to enhance the punishment of the parent). 
Likewise, subsection (T) could not disappoint any reasonable reliance
Appellant could have placed on the law when she was convicted of murder, nor
could the termination constitute a surprise, because under subsection (E),
which allows for termination if a parent engages in conduct that endangers the
child=s physical or emotional well-being, murder of one parent by the other
has long been considered a ground for termination.  See In re S.B., 207 S.W.3d 877,
885 (Tex. App.CFort Worth
2006, no pet.) (affirming termination under subsection (E) when father murdered
children=s mother while the children were present); see also Porter v. Texas
Dept. of Protective & Regulatory Servs., 105 S.W.3d 52, 59 (Tex. App.CCorpus Christi 2003, no pet.) (affirming termination for endangerment
under subsection (E) when, among other facts, two of the four children saw
their father shoot and kill their mother); In re B.R., 950 S.W.2d 113,
121 (Tex. App.CEl Paso
1997, no writ.) (citing, among other facts, evidence showing that the father
murdered the child=s mother as
sufficient to establish endangerment under subsection (E)), disapproved of
on other grounds by C.H., 89 S.W.3d at 26, and In re J.F.C., 96
S.W.3d 256, 267 n.39 (Tex. 2002); Smith v. Sims, 801 S.W.2d 247, 250
(Tex. App.CHouston
[14th Dist.] 1990, no writ) (stating that murder of the child=s other parent and the resulting imprisonment are sufficient to
terminate under subsection (E)); In re S.K.S., 648 S.W.2d 402, 404 (Tex.
App.CSan Antonio 1983, no writ) (affirming termination on failure to
support but noting that if the father=s conviction had not been on appeal, Asurely a final conviction for the murder of the mother of the child
would constitute the conduct described in sub[section] (E)@).  Appellant therefore could
not have reasonably assumed that her parental rights could not be terminated if
she murdered E.M.N.=s
father.  Subsection (T) merely facilitates
what could otherwise be done under another ground, in a public acknowledgment
of the hardships suffered by the family of the murdered parent.  See Tex. H.R. Res. 193.








Appellant cites Shaw to
support her ex post facto argument.  In Shaw,
one of the grounds for termination was the constructive abandonment provision
in subsection (N), which requires that for termination, the State must have
been the child=s managing
conservator for Anot less
than one year.@  966 S.W.2d at 179.  The court in Shaw held that the
statute violated the ex post facto provision because, in calculating the one‑year
period required by subsection (N), the court had to include time prior to the
1995 date on which the statute became effective.  Id. at 182.  Here, the ex post facto characteristics in
Shaw, which focused on the timing and duration of the abandonment, are not
present.  Appellant=s Shaw-based argument, therefore, is inapposite.

Nor does subsection (T) now
sanction Appellant for an action, murder, that was legal when she committed
it.  In A.R.R., we held that the
application of subsection (L), which addresses causing death or serious injury
to a child, to  terminate the father=s parental rights did not constitute an ex post facto violation, even
though he committed the sexual assault on his daughter in 1990 and subsection
(L) was not enacted until 1997.  A.R.R.,
61 S.W.3d at 696.  We reasoned that since
1986 the family code has provided that one basis for termination of a parent=s rights is if the parent has been adjudicated criminally responsible
for the death of or serious injury to a child. 
Id.; see Tex. Fam.
Code Ann. ' 15.02(L)
(Vernon 1986) (current version at Tex.
Fam. Code. Ann. '  161.001(1)(L)).  Any sort of crime against a child, including
sexual assault, constituted Aserious injury@ to the
child, so that the application of the new subsection (L) did not constitute a
violation of the Texas Constitution=s ex post facto provisions.  A.R.R.,
61 S.W.3d at 696.








We hold that the Texas
Supreme Court=s reasoning
in A.V. and our reasoning in A.R.R. apply to the facts before
us.  Despite her conviction and
imprisonment before subsection (T)=s enactment, Appellant=s rights were not violated by its retroactive application.  See A.V., 113 S.W.3d at 356-57.  E.M.N. and Appellee, her grandmother, are
part of the public whose interest subsection (T) advances.  See id. at 361.  Subsection (T)=s underlying purpose is not to add additional punishment to Appellant
for murdering E.M.N.=s father,
but to safeguard the public welfare and advance the public interest by
facilitating termination when one parent murders the otherCan act previously used to support terminations under subsection
(E).  See id.  Therefore, Appellant cannot now claim surprise
and damage to her settled expectations under these circumstances.[13]  See id.; see also S.B.,
207 S.W.3d at 885.








Benefits & Defenses

Appellant additionally argues
that by applying subsection (T), the trial court denied her the use or benefit
of defenses that existed under previously‑enacted sections of the involuntary
termination statute, under which, she admits, the trial court Avery well might have found that the burden of proof ha[d] been met.@  Because Appellant=s rights were terminated under subsection (T), we will address only
the defenses she discusses under subsections (D) and (E), the termination
grounds most similar to subsection (T).[14]













Appellant refers to
subsections (D) and (E), the endangerment grounds,[15]
for the propositions that a parent can defend against these by showing that she
made adequate provisions for the child and that conviction and imprisonment
alone are not enough for endangerment. 
However, she cites Naquin for the adequate provisions
proposition, a no-evidence case that provides no support for her argument.  See Naquin v. Tex. Dept. of Human Servs.,
722 S.W.2d 448, 450 (Tex. App.CEl Paso 1986, no pet.) (holding that there was no evidence under
subsections (B), (D), (E), or (F) to support termination).  She cites our decision in In re D.T.
for the proposition that conviction and imprisonment alone are not sufficient
to prove endangerment.  See In re D.T.,
34 S.W.3d 625, 633 (Tex. App.CFort Worth 2000, pet. denied). 
However, in D.T., we held that conviction and imprisonment are
factors to consider in determining endangerment, in addition to the type of
crime committed.  Id. at 635-36,
638.  We stated, in our factual
sufficiency review, that we should look not only at incarceration as a factor
but also at the expected length of the sentence and whether the underlying
conduct is of a type, in and of itself, from which endangerment of the child
may be inferred.  Id. at 638.  D.T. is clearly distinguishable from
this case in that the mother in D.T. was convicted and incarcerated for
writing bad checks, not for murdering the child=s father.  Id. at
639.  The facts here are more similar to
the facts in the cases we cited in D.T. for the proposition that the
underlying conduct for which a parent was imprisoned merits review.  See id. at 636.








Finally, Appellant cites our
holding in E.S.S. for the proposition that a murder conviction alone is
insufficient to support a termination under subsection (E).  See E.S.S., 131 S.W.3d at 639.  However, in E.S.S., the murder victim
was not the other parent.  Id.
at 634-35.  The child=s mother and stepfather petitioned to terminate the rights of the
father, who was serving a life sentence for the murder of someone who was not
the child=s mother, in
conjunction with the stepfather=s request to adopt the child.  Id.  The appeal addressed the father=s agreement to voluntarily relinquish his rights and his subsequent
attempt to revoke that agreement.  Id.
at 635-36.  It was under those
circumstances that we held that there was insufficient evidence under
subsection (E) to support the trial court=s endangerment finding: when the evidence consisted of Aa single statement regarding [the father=s] prison sentence for murder,@ that is, the father=s admission that he was serving a life sentence, and precedent
indicated, as in D.T., that mere imprisonment was not enough to
constitute a course of endangering conduct. 
Id. at 639.








What Appellant fails to
acknowledge in her review of all of these subsections and defenses is that, by
their very nature, termination cases are driven by their facts.  What might constitute a Adefense@ in some
circumstances will not necessarily carry over to other circumstancesCthere is a significant distinction in the effect on the child, for
example, between a parent=s conviction
and incarceration for writing bad checks, and a parent=s conviction and incarceration for murder of the child=s other parent.  Compare S.B.,
207 S.W.3d at 885, with D.T., 34 S.W.3d at 639.  Our review of applicable precedent indicates
that the murder of one parent by another constitutes a ground for termination,
and Appellant has failed to demonstrate that termination, under subsection (E)
or otherwise, for such conduct allows for any defenses that were unavailable to
her under subsection (T).  Therefore,
termination of Appellant=s parental
rights under subsection (T) did not violate her rights against retroactive
application of laws and did not deny her any defenses that might otherwise have
been available under the older subsections applicable to these facts.  We overrule Appellant=s first issue.

Sufficiency Of The Evidence

In her second issue,
Appellant complains about the legal and factual sufficiency of the evidence to
prove the best interest finding under section 161.001(2).[16]  Tex.
Fam. Code Ann. ' 161.001(2).

Legal & Factual Sufficiency Standard
Of Review








Termination of parental
rights is a drastic remedy and is of such weight and gravity that due process
requires the petitioner to justify termination by clear and convincing
evidence.  Id. '' 161.001, 161.206(a); J.F.C., 96 S.W.3d at 263.  This intermediate standard falls between the
preponderance standard of ordinary civil proceedings and the reasonable doubt
standard of criminal proceedings.  In
re G.M., 596 S.W.2d 846, 847 (Tex. 1980); In re K.W., 138 S.W.3d
420, 425 (Tex. App.CFort Worth
2004, pet. denied).  It is defined as the
Ameasure or degree of proof that will produce in the mind of the trier
of fact a firm belief or conviction as to the truth of the allegations sought
to be established.@  Tex.
Fam. Code Ann. ' 101.007.

The higher burden of proof in
termination cases elevates the appellate standard of legal sufficiency
review.  J.F.C., 96 S.W.3d at
265.  The traditional no‑evidence
standard does not adequately protect the parent=s constitutional interests.  Id.
 In reviewing the evidence for legal
sufficiency in parental termination cases, we must determine whether the
evidence is such that a factfinder could reasonably form a firm belief or
conviction that the grounds for termination were proven.  Id. at 265‑66.  We must review all the evidence in the light
most favorable to the finding and judgment. 
Id. at 266.  This means
that we must assume that the factfinder resolved any disputed facts in favor of
its finding if a reasonable factfinder could have done so.  Id. 
We must also disregard all evidence that a reasonable factfinder could
have disbelieved.  Id.  We must consider, however, undisputed
evidence even if it is contrary to the finding. 
Id.  That is, we must
consider evidence favorable to termination if a reasonable factfinder could,
and disregard contrary evidence unless a reasonable factfinder could not.  City of Keller v. Wilson, 168 S.W.3d
802, 827 (Tex. 2005).








This higher burden of proof
also elevates the appellate standard of factual sufficiency review.  C.H., 89 S.W.3d at 25.  A[A] finding that must be based on clear and convincing evidence cannot
be viewed on appeal the same as one that may be sustained on a mere
preponderance.@  Id. at 25.  In considering whether the evidence of
termination rises to the level of being clear and convincing, we must determine
whether the evidence is such that a factfinder could reasonably form a firm
belief or conviction that the grounds for termination were proven.  Id. 
Our inquiry here is whether, on the entire record, a factfinder could
reasonably form a firm conviction or belief that the termination of the parent=s parental rights would be in the best interest of the child.  Id. at 28.

The distinction between legal
and factual sufficiency lies in how we review the evidence.  J.F.C., 96 S.W.3d at 266.  In a factual sufficiency review, in
determining whether the evidence is such that a factfinder could reasonably
form a firm belief or conviction that its finding was true, we must consider
whether disputed evidence is such that a reasonable factfinder could not have
resolved it in favor of the finding.  Id.  If, in light of the entire record, the
disputed evidence that a reasonable factfinder could not have credited in favor
of the finding is so significant that a factfinder could not reasonably have
formed a firm belief or conviction in the truth of its finding, then the
evidence is factually insufficient.  Id.








Nonexclusive factors that the
trier of fact in a termination case may use in determining the best interest of
the child include: the desires of the child; the emotional and physical needs
of the child now and in the future; the emotional and physical danger to the
child now and in the future; the parental abilities of the individuals seeking
custody; the programs available to assist these individuals to promote the best
interest of the child; the plans for the child by these individuals or by the
agency seeking custody; the stability of the home or proposed placement; the
acts or omissions of the parent which may indicate that the existing parent‑child
relationship is not a proper one; and any excuse for the acts or omissions of
the parent.  Holley v. Adams, 544
S.W.2d 367, 371‑72 (Tex. 1976). 
These factors are not exhaustive; some listed factors may be
inapplicable to some cases; other factors not on the list may also be
considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed
evidence of just one factor may be sufficient in a particular case to support a
finding that termination is in the best interest of the children.  Id. 
On the other hand, the presence of scant evidence relevant to each Holley
factor will not support such a finding.  Id.








Here, E.M.N.=s desires were made known by the discussion and entry into evidence of
a note E.M.N. had written to her amicus attorney.[17]
 Martha, Appellee=s niece and co-joint managing conservator of E.M.N., testified that
neither she nor her husband Tony had influenced E.M.N. to write the note.
Martha read the note, which was in E.M.N.=s handwriting, aloud: 

(1)
I[>]m
afraid of [Appellant].

(2) I
want to be safe with my family.

(3) I=m
happy to be with my family again.

(4)
I[>]m
afraid of [Appellant] kidnaping me.

(5) I
don[>]t
want to live with [Appellant].

 








Appellee testified about
E.M.N.=s daily activities, which included going to school, gymnastics, and
cheerleading, while living with Martha and Tony during the week.  She testified that E.M.N. stayed with her on
the weekends and is very happy.  Appellee
also testified about the expanded family network available to E.M.N. in the
area and that if E.M.N. needed counseling, she would get counseling for
her.  Appellee also testified that she
gives Appellant=s letters to
E.M.N. but that, Asometimes
she reads them, sometimes she don=t,@ and that
E.M.N. does not write back to her mother, even though Appellee has told her
that if she wanted to write to Appellant, Appellee would mail the letters for
her.  Martha gave similar testimony.

E.M.N.=s first grade teacher, April Becker, testified by deposition.  Becker testified about E.M.N.=s first day at school and about how Martha had accompanied E.M.N. and
reassured her.  Becker testified,

I
just remember very vividly Martha was there waiting for [E.M.N.] at the end of
pretty much every day right outside the school so [E.M.N.] knew to look for her
at the end of the day.  And if it wasn=t
her, on occasion it was Tony, her uncle, or it was Brandon, her cousin. . . .
[E.M.N.] was never left waiting, wondering.

 

She described E.M.N. as Aa piece of sunshine,@ and that Ashe=s the kind that smiles at you and you can=t help but smile back and just be happy because she=s so sweet and happy.@  Many photos of E.M.N. were
admitted as exhibits. Becker also testified that Martha and Tony had provided
everything E.M.N. needed for school and for participation in extracurricular
activities, that E.M.N. appeared happy and well-cared-for, and that she was
academically on-target for her age group. 
E.M.N.=s report
card was admitted into evidence.








Tony testified that he and
Martha had been married for twenty years and that they have a sixteen-year-old
son, Brandon.  Martha testified that she
also had a twenty-two year-old son, David, whom she gave up for adoption when
he was three days old and with whom she now has a good relationship.  Martha testified that she had been sexually
abused by her father when she was very young, that she had gone through a lot
of counseling, and that Appellee had been a strength to her.  Martha and Tony completed a thirty-hour
parenting course to certify them as foster and adoptive foster parents.  They testified that if the trial court
granted the request for termination, their intent was to adopt E.M.N.  Martha, Tony, and Appellee testified that
they had the financial and physical abilities to take care of E.M.N.








Appellant testified that her
plans upon her release were to reunite with her daughters, to get a job, and to
find a place to stay.  She indicated that
she would probably live with her father or with her Aspiritual mentor.@  She listed the courses she had
taken while incarcerated, including various rehabilitation classes, NA, and
AA.  When asked if she was Aremorseful for [her] prior act,@ she replied, AMost
definitely.@  She testified about using Acrack cocaine@ and acknowledged
that New Mexico=s
CPS-equivalent had filed a motion to terminate her parental rights to J.J.  She also testified about her history with
abusive men, J.J.=s father and
E.M.N.=s father, and that when E.M.N. was born, she had tried to stop using
drugs and failed.  When asked about the
murder, she indicated that it did not occur to her that she was damaging her
children.  The trial court indicated that
it would not allow her to testify about the facts surrounding her conviction
because she had pled guilty.  Certified
copies of Appellant=s and her
mother=s convictions for the murder of E.M.N.=s father were admitted into evidence.

With regard to Appellant=s specific issue, that there was no evidence or insufficient evidence
that the termination and separation of the two siblings was in E.M.N.=s best interest, there was no evidence in the record that Appellee,
Martha, or Tony had any intention of separating the sisters.  To the contrary, all three testified about
E.M.N.=s visit with J.J., and Appellee and Tony indicated that they would
keep E.M.N. in contact with her. 
Appellee testified that she had offered to take J.J., that they had a
birthday party for J.J. during her visit, and that she had allowed J.J.=s foster family to park their travel trailer on her property when they
were there with J.J. during the previous summer.  Appellee conceded that if she had to take
E.M.N. to visit J.J. in New Mexico, she would, but preferred that J.J. come to
Texas, for AChristmas,
summers, and stuff.@  She testified that E.M.N. and J.J. talk on
the phone, and that she would be willing to obtain internet access so that J.J.
and E.M.N. could write to each other.








Having reviewed this evidence
in the light most favorable to the finding and judgment, we conclude that it
was legally sufficient, such that the factfinder could reasonably have formed a
firm belief or conviction that it was in E.M.N.=s best interest to terminate Appellant=s parental rights.  See J.F.C.,
96 S.W.3d at 265-66.  Upon review of the
entire record, we conclude that the evidence was also factually sufficient to
support the firm belief or conviction necessary to the trial court=s best interest finding.  See
C.H., 89 S.W.3d at 25, 28.  This case
strongly resonates with the Texas Supreme Court=s words in C.H., that A[j]ust as it is imperative for courts to recognize the constitutional
underpinnings of the parent‑child relationship, it is also essential that
emotional and physical interests of the child not be sacrificed merely to
preserve that right.@  Id. at 26.  We overrule Appellant=s second issue.

CONCLUSION

Having overruled both of
Appellant=s issues, we
affirm the trial court=s judgment.

 

 

DIXON W. HOLMAN

JUSTICE

 

PANEL
B:  DAUPHINOT, HOLMAN, and MCCOY, JJ.

 

DELIVERED:  April 5, 2007











[1]Appellant testified about her
history with abusive men.  She also
testified that her brother had given J.J. a black eye and that she would
understand if her daughters were afraid of him.





[2]New Mexico=s equivalent of Texas=s Child Protective Services (ACPS@) picked up E.M.N. and J.J. when
Appellant=s father passed out in his truck in
a parking lot.  Appellant=s father suffered a transient
ischemic attack, a medical condition, while on the witness stand at the
termination trial.





[3]Appellant=s mother pled guilty to the same
offense, was convicted, and received thirty years= confinement.  E.M.N.=s amicus attorney asked Appellant, ADo you recall that you made a
comment about a juncture in which you could have made a choice . . . [when] you
were in the middle of being tried for this . . . murder, that . . . you could
either pick your mother or your children, . . . what did you tell me you
picked?@ 
Appellant replied, AI chose not to testify against my mom,@ acknowledging that she knew at
that point that she was hurting her children and herself.  Appellant=s father testified that he thought another man, who was
with Appellant and his wife, shot E.M.N.=s father, and that he did not think Appellant and his wife
had done it.





[4]The Texas court found that E.M.N.
was unlawfully removed from Tarrant and Johnson counties in violation of its
2001 order.





[5]Appellee testified that she also
offered to take J.J., but that J.J. and Appellant refused that offer.  Appellee promised to keep J.J. in E.M.N.=s life. 





[6]To preserve a complaint for our
review, a party must have presented to the trial court a timely request,
objection, or motion that states the specific grounds for the desired ruling,
if they are not apparent from the context of the request, objection, or
motion.  Tex. R. App. P. 33.1(a). 
If a party fails to do this, error is not preserved, and the complaint
is waived.  Bushell v. Dean, 803
S.W.2d 711, 712 (Tex. 1991) (op. on reh=g).  It is undisputed
that Appellant did not raise her ex post facto issue at trial.

However, error is not
waived if it falls within the narrow category of Afundamental error,@ which requires no trial court
predicate for appellate review.  In re
B.L.D., 113 S.W.3d 340, 350 (Tex. 2003), cert. denied, 541 U.S. 945
(2004).  Fundamental error exists Ain those rare instances in which
the record shows the court lacked jurisdiction or that the public interest is
directly and adversely affected as that interest is declared in the statutes or
the Constitution of Texas.@  Wal‑Mart
Stores, Inc. v. Alexander, 868 S.W.2d 322, 328 (Tex. 1993) (quoting Pirtle
v. Gregory, 629 S.W.2d 919, 920 (Tex. 1982)).  This is such an appeal because of the public=s interest, as stated in article I,
section 16 of the Texas Constitution, in avoiding the retroactive application
of laws.  See Tex. Const. art. I, ' 16.  Therefore, although Appellant did not raise
her ex post facto claim in the trial court, we may review it.  Cf. Ieppert v. State, 908 S.W.2d 217,
220 (Tex. Crim. App. 1995) (holding that no preservation is required to raise
ex post facto complaint in criminal cases).





[7]A true ex post facto law is a law
that (1) punishes as a crime an act previously committed that was innocent when
done, (2) changes the punishment and inflicts a greater punishment than the law
attached to the criminal offense when committed, or (3) deprives a person
charged with a crime of any defense available at the time the act was committed.  See Johnson v. State, 930 S.W.2d 589,
591 (Tex. Crim. App. 1996); Grimes, 807 S.W.2d at 587. 





[8]Article I, section 16 states that
no bill of attainder, ex post facto law, retroactive law, or any law impairing
the obligation of contracts, shall be made. 
Tex. Const. art. I, ' 16. 





[9]Southwestern Bell relies heavily on Texas Water
Rights Commission v. Wright, in which the Texas Supreme Court discussed the
underlying rationales for upholding or striking retroactive statutes.  Sw. Bell, 615 S.W.2d at 956-57; see
Tex. Water Rights Comm=n v. Wright, 464 S.W.2d 642, 649 (Tex. 1971) (addressing statute
authorizing the cancellation of water permits after ten years of continuous
nonuse).  The Wright court recited
various viewpoints before holding that the statute at issue was not invalid
despite its retroactive effects:

 

One has said that Athe most important single inquiry
to be made, from the standpoint of the individual and aside from the public
interest, is whether the retroactive law gives effect to or defeats the bona
fide intentions or reasonable expectations of the persons affected.@ . . . Another has said that the
common characteristic in the cases holding a statute invalid is the element of
surprise, by which a person has changed his position or omitted to change it in
reliance upon the law in force. . . . Still another has said, AWhere a statute has become a likely
basis for substantial reliance by people who may have changed their positions
to reap its benefits, the policy against retroactive change is strong.@ 

 

464 S.W.2d at 649 (internal citations omitted).

The United States
Supreme Court observed in Landgraf v. USI Film Products that a statute
does not operate Aretrospectively@ merely because it is applied in a
case arising from conduct antedating the statute=s enactment or because it upsets
expectations based in prior law.  511
U.S. 244, 269, 114 S. Ct. 1483, 1499 (1994) (holding that new statutory
provisions enacted while case was pending on appeal did not apply to that
case).  Rather, the test is whether the
new provision attaches new legal consequences to events completed before its
enactment, based on a review of the nature and extent of the change in the law
and the degree of connection between the operation of the new rule and a
relevant past event.  See id.
at 270, 114 S. Ct. at 1499.  The Court
observed that while any test of retroactivity will leave room for disagreement
in hard cases, Afamiliar considerations of fair
notice, reasonable reliance, and settled expectations offer sound guidance.@ 
Id., 114 S. Ct. at 1499.





[10]The court referred to the parent=s convictions for dealing drugs,
his attempted prison escape, the imposition of a one‑hundred‑and‑forty
month sentence, and stated that, under those circumstances, he Acould not reasonably expect that
the State would not act to provide a safe environment for his children while he
was imprisoned,@ making reference to the collateral
consequences doctrine discussed by the court of criminal appeals in Scott v.
State, 55 S.W.3d 593 (Tex. Crim. App. 2001).  A.V., 113 S.W.3d at 361.  The court of criminal appeals stated in Scott
that A[t]he resolution of criminal
charges will always carry the possibility of collateral consequences, and as
long as those consequences are not statutorily restricted, disabilities and
disqualifications which the defendant might not have anticipated may proceed
from the prior cause.@ 
Scott, 55 S.W.3d at 597.





[11]Although Appellant calls Appellee=s termination suit a Alitigation of convenience,@ rather than of necessity, there is
nothing in the record to indicate that anything about this case was convenient
or unnecessary.  Appellee testified that
the jurisdictional battle took three years and cost between $60,000 and
$70,000.  Appellee testified that she
wanted her granddaughter with family, and not in foster care, because she felt
that E.M.N. was safer that way.





[12]Donna Hoedt=s husband murdered her in
1996.  Tex. H.R. Res. 193, 79th Leg.,
R.S. (2005) (resolution paying tribute to the life of Donna Hoedt),
http://www.legis.state.tx.us/tlodocs/791/billtext/html/HR00193I.htm (last
visited March 30, 2007).  Her mother then
fought a legal battle to terminate the husband=s parental rights to the four
children.  Id.  Dennis Bonnen, the act=s sponsor, stated that he was
pleased to sponsor HB 657, which added subsection (T) to section 161.001, and
that A[i]t was a shame that [the
grandmother] was having to ask the man who murdered her daughter about her
grandchildren=s medical care.@ 
See Dennis Bonnen, Donna Hoedt Act Becomes Law,
http://www.dennisbonnen.com/2005‑07‑28/Hoedt.HTM (last visited
March 30, 2007).  He called that Aadditional victimization@ of the family.  Id. 





[13]We observe that, rather than
additional punishment, the termination here was a collateral consequence of
Appellant=s conviction, as referenced in A.V.  See A.V., 113 S.W.3d at 361.  We also note that subsection (T) could be
interpreted as a remedial statute.  A
remedial statute has been defined as Aone which introduces a new regulation for the advancement
of the public welfare or conducive to the public good, one enacted to afford a
remedy, or one intended to correct defects, mistakes, and omissions in the laws
of the State.@ 
Sims, 922 S.W.2d at 217.  A
remedial statute generally addresses remedies or procedures.  Id. 
As discussed above, subsection (T) advances public welfare and was
enacted to facilitate parental rights termination under circumstances in which one
parent murders the otherCcircumstances previously
incorporated under subsection (E).  See
S.B., 207 S.W.3d at 885.  If not
remedial in itself, subsection (T) is analogous to a remedial statute in that
it now provides a specific ground and specific relief to the family of a
murdered parent, rather than its previous incorporation under the Aendangerment@ umbrella.  See Tex. H.R. Res. 193.





[14]To bolster her defense argument,
Appellant also addressed the Aabandonment@ subsections, (A), (B), and (C), which revolve around
voluntarily leaving the child alone or in the possession of another not the
parent, with or without expressing intent to return and without providing for
adequate support for varying time periods. 
See Tex. Fam. Code Ann.
' 161.001(1)(A)‑(C).  She recites, as a defense to these grounds, a
showing by the parent that she made arrangements for adequate care and support
of the child.  See Holick, 685
S.W.2d at 21.  Appellant argues that if
her termination had been brought on one of these grounds, the fact that she had
placed her daughters with her father and then with family friends, the New
Mexico foster family, would have constituted a defense, and that Appellee=s seeking termination under only
subsection (T) deprived her of this defense or any others.

Appellant neglects to
address her violation of the terms of the court=s 2001 order that these
arrangements constituted, and otherwise presents mere speculation as to this
issue because termination was brought on a ground more similar to endangerment
than abandonment.  We respond similarly
to her argument on subsection (F), the Afailure to support@ ground, for which she cites Mayfield for the
proposition that inability to pay is a defense, but makes no contention that
this ground or its defense apply to the particular facts under which her rights
were terminated.  See Mayfield
v. Smith, 608 S.W.2d 767, 769-70 (Tex. Civ. App.CTyler 1980, no writ.).  Likewise, we dismiss her argument about a Apotential@ defense to subsection (Q), the Atwo-year incarceration@ ground, in which she cites Frederick
with regard to triable issues of fact on care. 
See Brazoria County CPS v. Frederick, 176 S.W.3d 277, 280 (Tex.
App.CHouston [1st Dist.] 2004, no pet.)
(remanding for consideration by jury after father received a directed verdict
and CPS appealed).





[15]To justify termination under
subsection (D), the parent must have knowingly placed or knowingly allowed the
child to remain in conditions or surroundings that endanger the physical or
emotional well‑being of the child. 
Tex. Fam. Code Ann. ' 161.001(1)(D).  To do so under subsection (E), the parent
must have engaged in conduct or knowingly placed the child with persons who
engaged in conduct that endangers the physical or emotional well‑being of
the child.  Id. ' 161.001(1)(E).





[16]Appellant specifically complains
that there was no evidence or insufficient evidence that the termination and
separation of the two siblings was in E.M.N.=s best interest. 
However, in the interest of completeness, we will consider this
complaint within a full review of the trial court=s overall best interest finding.





[17]The amicus attorney also reported
her findings to the trial court at the close of testimony, indicating that she
questioned Appellant=s stability and her ability to
provide a stable environment for E.M.N., and that Appellant=s history of being around abusive
men, if continued once Appellant was released from prison, would be a danger to
E.M.N.  Her recommendation was to
terminate Appellant=s parental rights.